**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

---

|  |  |  |
|---|---|---|
| TYHEEM STEWART, | : | |
| | : | |
| Petitioner, | : | Civil Action No. 11-0005 (FSH) |
| | : | |
| v. | : | **O P I N I O N** |
| | : | |
| CINDY SWEENEY, et al., | : | |
| | : | |
| Respondents. | : | |

---

**HOCHBERG**, District Judge

Petitioner Tyheem Stewart ("Petitioner") filed a Petition for a Writ of Habeas Corpus pursuant to 28 U.S.C. § 2254(a) challenging a judgment of conviction entered by the Superior Court of New Jersey upon Petitioner's guilty plea.  Following this Court's order advising Petitioner of his rights under Mason v. Meyers, 208 F.3d 414 (3d Cir. 2000), Respondents were directed to file an answer and duly complied.  Although allowed an ample opportunity to file his reply, Petitioner elected not to make such submission.

For the reasons expressed below, the Court will dismiss the Petition with prejudice and will decline to issue a certificate of appealability.  See 28 U.S.C. §§ 2253(c), 2254(a), (b), (c).

## I.  BACKGROUND

The underlying events of Petitioner's conviction were defined by the Superior Court of New Jersey, Law Division, as follows:

> On November 75, 2002, [Petitioner] got into an altercation with Charles Bogart because [Petitioner] believed that Mr. Bogart had broken a window in [Petitioner's] apartment and stolen [Petitioner's] money.  According to the

Paterson Police Report, Mr. Bogart went over to 80 Belmont Ave to pick up an acquaintance [who, seemingly, was a certain Mr. Hall] and [Petitioner] and lend him his vehicle so [Petitioner] could run errands.  Later on in the day, [Petitioner], who was now accompanied by his brother, returned to Mr. Bogart's house [and] the four men returned to [Petitioner's] residence.  Once they arrived at [Petitioner's] residence, [Petitioner] accused Mr. Bogart of stealing money.  Mr. Bogart told him he didn't know what [Petitioner] was talking about.  According to Mr. Bogart, [Petitioner then] threatened to kill him and then walked over to Mr. Hall [who, seemingly, was the fourth person] and placed the gun inside Mr. Hall's mouth and asked him, "Where is my money'?"  Shortly thereafter, Mr. Bogart attempted to disarm [Petitioner] by grabbing the barrel of the handgun.  A struggle ensued and continued until [Petitioner] gained control of the gun and struck Mr. Bogart once in the head.  Mr. Bogart began to bleed profusely.  Afterward, [Petitioner] tied Mr. Bogart up with the rope and told him he was going to have to wait there until [Petitioner] and his brother returned from Mr. Bogart's residence. [Petitioner], alone with his brother, and Mr. Hall, [who was taken] against his will, left for Mr. Bogait's residence to search for the missing money.  Shortly after the three men left, Mr. Bogart was able to free himself and flee the residence.  Mr. Bogart then contacted police.  Following a dispatch, detectives arrived at the Belmont Avenue residence.  Because the detectives believed that victims were being held against their will inside the apartment, the front door was forced open.  Once the detectives learned that the residence might belong to the suspect, they exited and sealed the apartment.  An investigation ensued, which resulted in the [Petitioner's] arrest on November 20, 2002.

Docket Entry No. 8-3, at 6-7; accord Docket Entry No. 8-4, at 97-98 (providing a more detailed account of the same, including details of Petitioner's purchases of laundry rope and duct tape).

Petitioner was charged, in connection with that offense, with two counts of kidnapping, carjacking, aggravated assault, robbery, terroristic threats, possession of a weapon for unlawful purpose, unlawful possession of a weapon, possession of a controlled substance, possession with intent to distribute and possession with intent to distribute within 500 feet of public housing.[1]

---

[1]  It appears that Petitioner's arrest was accompanied by a search that resulted in controlled substance-related charges; it also appears that – at the time – Petitioner had another indictment pending, being charged with receipt of stolen property.

Petitioner asserts that he "agreed to plead guilty to charges contained within the State's indictment. [However,] during the [first round of] plea proceeding, [his] trial court sought a factual allocution from [P]etitioner.  Petitioner refused to plead guilty to kidnapping in that he did not agree with the assertion that he had, in fact, committed that offense."  Docket Entry No. 1, at 4-5.  Petitioner also alleged that the trial court refused to accept the plea agreement without Petitioner's statement that Petitioner committed kidnapping within the meaning of that offense, as it was defined by the penal code, and so the plea proceedings were adjourned.  See id. at 5. Petitioner maintains that, upon that development, his counsel pressured him to "agree[] to plead guilty in the manner that the State and the court wanted [Petitioner] to" plead, i.e., in the "manner" where Petitioner would accept the fact that the acts Petitioner, which conceded committing, were, in fact, the acts falling within the definition of kidnapping, as it was provided by the penal code.[2]   When Petitioner agreed to plead guilty to the offenses made part of his plea agreement, including the offenses of kidnapping and terroristic threats, the plea proceedings resumed, and the agreement was accepted by the trial court.[3]

---

[2]   The best this Court can surmise upon studying the rather extensive record provided in this matter, it appears that Petitioner perceived the crime of kidnapping not within its technical meaning, as defined by the penal code, but in terms common to books and movies, where the act of kidnapping it typically depicted as having a person, tied and/or blindfolded, moved to an undisclosed location and held for ransom.  Petitioner's statements made during his proceedings before the trial court strongly suggest that Petitioner had a problem correlating this unfortunate, entertainment-industry-produced, image of kidnapping with his acts of tying and confining Mr. Bogart at Petitioner's residence and/or with his act of forcing Mr. Hall to accompany Petitioner to Mr. Bogart's residence, even though these acts squarely fell within the definition of kidnapping provided by the penal code, and Petitioner never disputed committing these acts. Correspondingly, Petitioner had to be explained the technical meaning of the term "kidnapping" during his plea proceedings.

[3]   It appears that, similarly to Petitioner's distorted perceptions of kidnapping (which were
(continued...)

3

The relevant part of the transcript of Petitioner's plea proceedings read as follows:

| | |
|---|---|
| Petitioner's Counsel: | Mr. Stewart, regarding counts one and six, which charge you with kidnapping, is it correct that on the 15th day of November of the year 2002, you were in the city of Paterson, County of Passaic? |
| Petitioner: | Yes. |
| Petitioner's Counsel: | On that date did you unlawfully remove both a Mr. Charles Bogart and a Mr. Christopher Hall a substantial distance and you did so and you confined these individuals for a substantial period of time? |
| Petitioner: | One person – just one person. |
| Petitioner's Counsel: | I have here Charles Bogart and count six, Christopher Hall. Did you kidnap both of these individuals? You didn't hold both of them against their will? |
| Petitioner: | He left – one of them left. |
| Petitioner's Counsel: | Did you attempt to hold both of these individuals against their will? |
| Petitioner: | Yes. |
| . . . | |
| Petitioner's Counsel: | you illegally confined these individuals with the purpose to rob them and/or to terrorize both of them; correct? |
| Petitioner: | No. |
| Petitioner's Counsel: | You didn't plan on robbing them? |
| Petitioner: | No, sir. |
| Petitioner's Counsel: | Did you plan to terrorize them? |
| Petitioner: | I planned to get back – returned what was tooken [sic] from me. |
| Petitioner's Counsel: | Do you [now] understand [that,] by holding these two individuals against their will[,] that [such act] constitutes terrorizing them? |
| Petitioner: | Yes. |
| . . . | |
| Prosecutor: | With respect to, I believe, Christopher Hall, in fact you went and bound Christopher Hall with a rope and tape around his mouth and put him into a cubbyhole outside of the apartment; isn't that correct? |

---

[3](...continued)
based not on the technical definitions provided by the penal code but on the images produced by the entertainment industry), Petitioner envisioned the offense of terroristic along the lines of tragic events of September 11. Correspondingly, Petitioner had to be explained the technical meaning of the term "terroristic threats" during his plea proceedings.

| | |
|---|---|
| Petitioner: | Yes. |
| Prosecutor: | And then he escaped? |
| Petitioner: | That's not Christopher Hall. |
| Prosecutor: | Well, Charles Bogart? |
| Petitioner: | Yes. |
| Prosecutor: | Then Charles Bogart subsequently escaped; is that correct? |
| Petitioner: | Yes. |
| Prosecutor: | But you did confine him against his will while you had him in the cubbyhole and inside your apartment; isn't that correct? |
| Petitioner: | Yes. |
| Prosecutor: | And you had intended to terrorize them in getting your money back; is that correct? |
| Petitioner: | Yes. |
| Prosecutor: | And you, in fact, also hit one or both of them, isn't that correct, with a handgun? |
| Petitioner: | One of them. |
| Prosecutor: | And which one was that? |
| Petitioner: | Charles. |
| Prosecutor: | Charles Bogart? |
| Petitioner: | Yes. |
| Prosecutor: | What – did you, in fact, also terrorize Christopher Hall by pointing the gun at both him and also Charles Bogart and attempt to get your money back; is that correct? |
| Petitioner: | Yes. |

Docket Entry No. 8-7, at 13-17.

In connection with Petitioner's act of literally taking his guilty plea, the following

exchange took place:

| | |
|---|---|
| The court: | Mr. Stewart, how old are you, sir? |
| Petitioner: | Twenty-four. |
| . . . | |
| The court: | Do you read, write and understand the English language? |
| Petitioner: | Yes. |
| The court: | Do you have any difficulties in understanding what's going on here today? |
| Petitioner: | No. |
| The court: | You understand everything so far? |
| Petitioner: | Yes. |

| | |
|---|---|
| The court: | As you know, sir, you're charged in this indictment with a number of offenses, including kidnapping in the first degree, two counts; robbery; carjacking, first degree; aggravated assault and a myriad of other offenses.  Do you understand that? |
| Petitioner: | Yes. |
| The court: | Now your attorney has worked out a plea agreement with the State as a result of which you'll be changing your pleas from not guilty to guilty on counts one, six, 12, and thirteen of this indictment; is that correct? |
| Petitioner: | Yes. |
| The court: | Counts one and six charge you with kidnapping in the first degree; and counts 12 and 13, possession of a weapon for unlawful purpose in the second degree; is that correct? |
| Petitioner: | Yes. |

. . .

| | |
|---|---|
| The court: | If you go to trial on these charges and you're found guilty, you could be sentenced to up to . . . [o]n the kidnapping charge, under the law, you can be sentenced to up to 60 years in State Prison with 25 years before parole. Do you understand that? |
| Petitioner: | Yes. |
| The court: | On the weapon offenses you can be sentenced up to 20 years in State Prison, ten years before parole consecutively. Do you understand that, sir? |
| Petitioner: | Yes. |
| The court: | The maximum fines there  – here would be seven hundred thousand dollars; the violent crimes penalty will be two hundred dollars; safe streets penalty will be three hundred dollars; law enforcement penalty, thirty dollars.  Do you understand that, sir? |
| Petitioner: | Yes. |
| The court: | Because of the nature of the offenses, any sentence imposed by the Court, you have to be ordered to serve 85 percent of that term.  Do you understand that? |
| Petitioner: | Yes. |
| The court: | That's because these cases fall within the provisions of the No Early Release Act.  Do you understand that, sir? |
| Petitioner: | Yes. |
| The court: | Do you further understand that upon completion of your prison sentence, when you get paroled, you will have to be under parole supervision for five years from the date of your parole?  Do you understand that? |

6

| | |
|---|---|
| Petitioner: | Yes. |
| . . . | |
| The court: | Your attorney has worked out a plea agreement with the State.  I want you to listen carefully.  The prosecutor will put the plea offer on the record.  When he's finished addressing me, I will tell you what I promised you. |

[The prosecutor reads the terms of the plea agreement into the record, and Petitioner's counsel confirms that the plea agreement is read as offered.]

| | |
|---|---|
| The court: | Mr. Stewart, did you hear what the prosecutor said? |
| Petitioner: | Yes. |
| The court: | And is that your understanding of the State's plea offer? |
| Petitioner: | Yes. |
| The court: | You understand the State is asking for 17 years; you have to do 85 percent before parole? |
| Petitioner: | Yes. |
| The court: | Do you understand that? |
| Petitioner: | Yes. |
| The court: | But I promised you this morning if I accept the plea, I will give you 15 years with 85 percent before parole.  Do you understand that? |
| Petitioner: | Yes. |
| . . . | |
| The court: | Furthermore, I have to make a finding that that by pleading guilty here today you are giving up certain rights that you have? |
| Petitioner: | Yes. |
| The court: | You have the right to have a trial by jury.  By pleading guilty, you're giving up that right.  Do you understand that? |
| Petitioner: | Yes. |
| The court: | At a trial the burden of proof is on the State.  The State has to prove that you are guilty beyond a reasonable doubt.  By pleading guilty, you're giving up that right.  Do you understand that? |
| Petitioner: | Yes. |
| The court: | If there's a trial, the State will call witnesses.  The witnesses will come into court and they will testify under oath.  Through your attorney you have the right to ask questions of those witnesses.  By pleading guilty here today, you're giving up that right.  Do you understand that? |
| Petitioner: | Yes. |

| | |
|---|---|
| The court: | Mr. Stewart, you may also testify, if you elect to do so. That is your right. [But] nobody can force you to testify. By pleading guilty, you're giving up that right [to testify]. Do you understand that? |
| Petitioner: | Yes. |
| The court: | You have the right to call witnesses, if you have any such witnesses. By pleading guilty you're giving up that right. Do you understand that? |
| Petitioner: | Yes. |
| The court: | If you have any outstanding motions, by pleading guilty here today you're giving up your right to proceed with whatever motions you may have.  Do you understand that, sir? |
| Petitioner: | Yes. |
| The court: | You have some forms there in front of you.  Let's go over those forms. Look at page three of the Plea Agreement. Did you sign your name there? |
| Petitioner: | Yes. |
| The court: | There are initials at the bottom of pages one and two. Are those your initials? |
| Petitioner: | Yes. |
| The court: | Did you put them there? |
| Petitioner: | Yes. |
| The court: | Did [your counsel] read that form to you before you signed it? |
| Petitioner: | Yes. |
| The court: | Did he read each and every question to you? |
| Petitioner: | Yes. |
| The court: | Did you understand the questions? |
| Petitioner: | Yes. |
| The court: | He read the questions, you gave him the answers, and he marked your answers off on the form; is that correct, sir? |
| Petitioner: | Yes. |
| The court: | So the answers are, in fact, your answers? . . . |
| Petitioner: | Yes. |
| The court: | You understand that by pleading guilty to these offenses you are giving up your right to have a jury determine beyond a reasonable doubt that you committed crimes of violence?  Do you understand that? |
| Petitioner: | Yes. |
| . . . | |
| The court: | Again, you understand that by signing this form you are telling me that the gun that you used on the day in question |

8

|              | was operable, that it was a working gun?  You're giving up your right to have a jury determine that.  Do you understand that? |
|--------------|------|
| Petitioner:  | Yes. |
| . . .        |      |
| The court:   | Knowing the penalties you're facing, do you still wish to plead guilty? |
| Petitioner:  | Yes. |
| The court:   | Why are you pleading guilty, Mr. Stewart? |
| Petitioner:  | 'Cause I done it. |

Id. at 2-13.

Following his guilty plea, Petitioner appealed his sentence, which was affirmed.  See

State v. Stewart, 2010 WL 1329706, at *1 (N.J. Super. Ct. App. Div., March 31, 2010) (per

curiam).  Petitioner then filed an application seeking post-conviction relief ("PCR"), during

which he asserted, for the first time, that his counsel was ineffective by not filing a certain

motion, not discussing the merits of Petitioner's case with Petitioner and "pressuring" Petitioner

into accepting the plea.  See id.

Addressing this challenge during the PCR proceedings, the trial court stated as follows:

[A] review of [Petitioner's] plea form filled out and initialed by [Petitioner], and the plea colloquy, clearly indicates that [Petitioner] did not have any problems with [his counsel's] representation. . . [Petitioner] never once raised the issue of his attorney's performance.  Nor does the transcript support his argument that he felt pressured to enter a guilty plea.
. . .
A review of the plea transcript indicates one thing: [Petitioner] was concerned about the amount of time he was required to serve as a result of his guilty plea. During the plea hearing, when asked about questions concerning the plea, [Petitioner] made no mention of counsel's performance.  Instead, [Petitioner] voiced concerns about getting an early sentence date and whether or not he could apply for a reconsideration of sentence after a certain time in the future. [Petitioner] was asked again by the court during the sentence hearing on December 5, 2003, "Mr. Stewart, is there anything you want to say to the court? Anything you want to say, sir?"  [Petitioner] replied, "Thank you for bringing the plea to the lowest that you could.  And hopefully, if I can be able to put in enough

9

time on this charge I be able to come back before reconsideration of some more time, some lesser plea." On two separate occasions, while on the record before the court, [Petitioner] was given an opportunity to voice any of his concerns or questions regarding his plea and the effectiveness of his counsel's representation. On both occasions, [Petitioner] expressed satisfaction with [his counsel's] performance and dissatisfaction he did not receive a better plea deal. On page 6 of the sentence hearing transcript, when the court asked [Petitioner] if he was prepared to proceed with sentencing, [Petitioner] replied, "Yes, sir, but I would like to know if it's any possibility of getting a lighter sentence than what I already have?" In [Petitioner's] pre-sentence report, [Petitioner] did say that he felt he was pressured into taking the plea. On page 7 of the sentence hearing transcript, [his counsel] made the conscious decision to remark:

Petitioner's counsel:   I spoke to Mr. Stewart in the back, Your Honor, regarding that ("that" refers to [Petitioner's] pre-sentence report remark that he felt pressured into taking the plea). He does maintain his guilty plea though, however, he was not satisfied with the plea agreement I was able to negotiate for him on his behalf [in terms of the length of his sentence], Judge, and [so] I would just like to place that on the record. Is that correct, Mr. Stewart?

Petitioner:   Yes.

[Indeed, t]he record is replete with instances of [Petitioner] expressing his concern about receiving a lighter sentence. [However, n]ever . . . did [Petitioner] express his concern that he was being forced to plea instead of go to trial. He was given the opportunity, time and again, to inform the court; that he felt he was being pressured by [his counsel] to plea; that he was dissatisfied with [his counsel's] performance; that, if he wanted to, he could make an application to the court to withdraw his plea and go to trial. However, each and every time, he expressed dissatisfaction with receiving a plea deal that did not have a shorter prison sentence. There is nothing in his moving papers or in the transcript that support his bare assertion that he was pressured into taking a plea over going to trial.

Docket Entry No. 8-3, at 12-14; accord Docket Entry No. 8-8, at 4.

Petitioner now challenges his conviction asserting that his trial counsel provided him with

ineffective assistance because the counsel did not interview unspecified witnesses, did not

discuss the "relative strength" of Petitioner's criminal case and pressured Petitioner to plead

guilty.[4]  See Docket Entry No. 1, at 3-4.

## II.  STANDARD OF REVIEW

Section 2254(a) of Title 28 of the United States Code gives the court jurisdiction to

entertain a habeas petition challenging a state conviction or sentence only where the inmate's

custody violates federal law:

> [A] district court shall entertain an application for a writ of habeas corpus in
> behalf of a person in custody pursuant to the judgment of a State court only on the
> ground that he is in custody in violation of the Constitution or laws or treaties of
> the United States.

28 U.S.C. § 2254(a).

"In conducting habeas review, a federal court is limited to deciding whether a conviction

violated the Constitution, laws, or treaties of the United States."  Estelle v. McGuire, 502 U.S.

62, 67-68 (1991); 28 U.S.C. § 2254(a); accord Barry v. Bergen County Probation Dept., 128 F.3d

---

[4]  The Court notes that Petitioner, seemingly trying to buttress his claim that his counsel pressured him into taking the guilty plea, also asserted, for the first time, that his counsel outright refused to represent Petitioner for purposes of any trial and offered assistance only to the extent Petitioner wished to plea guilty.  See Docket Entry No. 1, at 3.  The record accumulated before the state courts, including during Petitioner's PCR proceedings that expressly focused on Petitioner's counsel's performance, does not suggest, even vaguely, that Petitioner's counsel made any statements or representations to that effect, and so it appears that Petitioner resorted to "poetic license" in order to "amplify" his claims.  However, such employ of "poetic license" serves poorly to Petitioner because: (a) it renders the Petition subject to dismissal, as mixed (or, at best, allows him withdrawal of his newly-minted assertion that his counsel outright refused to assist him for the purposes of any trial), since this claim was never raised in the state courts, is long barred procedurally for the purposes of any state exhaustion and, in addition, lacks any good cause basis for stay and abeyance of the instant matter, see Rhines v. Weber, 544 U.S. 269, 277-78(2005); and, moreover, (b) it cuts against Petitioner's key position taken in the instant action since it prompts the reader to conclude that Petitioner indeed wanted to take only a guilty plea in light of the fact that the Petition fails to assert – and no statement in the record suggests, even remotely, – that at any point in time during his criminal proceedings Petitioner sought appointment of another counsel for the purposes of representing Petitioner at a criminal trial.

152, 159 (3d Cir. 1997).  "Federal courts hold no supervisory authority over state judicial proceedings and may intervene only to correct wrongs of constitutional dimension."  Smith v. Phillips, 455 U.S. 209, 221 (1982).  "If a state prisoner alleges no deprivation of a federal right, § 2254 is simply inapplicable.  It is unnecessary in such a situation to inquire whether the prisoner preserved his claim before the state courts."  Engle v. Isaac, 456 U.S. 107, 120 n.19 (1982).  "[E]rrors of state law cannot be repackaged as federal errors simply by citing the Due Process Clause."  Johnson v. Rosemeyer, 117 F.3d 104, 110 (3d Cir. 1997).  Moreover, "it is well established that a state court's misapplication of its own law does not generally raise a constitutional claim."  Smith v. Horn, 120 F.3d 400, 414 (3d Cir. 1997) (citation  omitted); see also Smith v. Zimmerman, 768 F.2d 69, 71, 73 (3d Cir. 1985).

A district court must give deference to determinations of state courts.  Duncan v. Morton, 256 F.3d 189, 196 (3d Cir.), cert. denied, 534 U.S. 919 (2001); Dickerson v. Vaughn, 90 F.3d 87, 90 (3d Cir. 1996).  Federal courts "must presume that the factual findings of both state trial and appellate courts are correct, a presumption that can only be overcome on the basis of clear and convincing evidence to the contrary."  Stevens v. Delaware Correctional Center, 295 F.3d 361, 368 (3d Cir. 2002).  Where a federal claim was "adjudicated on the merits"[5] in state court proceedings, § 2254 does not permit habeas relief unless adjudication of the claim

---

[5] "An 'adjudication on the merits' has a well settled meaning: a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground."  Rompilla v. Horn, 355 F.3d 233, 247 (3d Cir. 2004) (quoting Sellan v. Kuhlman, 261 F.3d 303, 311 (2d Cir. 2001)).  A state court may render an adjudication or decision on the merits of a federal claim by rejecting the claim without any discussion whatsoever.  Rompilla, 355 F.3d at 247.

(1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States; or

(2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A decision is "'contrary to' a Supreme Court holding if the state court 'contradicts the governing law set forth in [the Supreme Court's] cases' or if it 'confronts a set of facts that are materially indistinguishable from a decision of th[e Supreme] Court and nevertheless arrives at a [different] result." Williams v. Taylor, 529 U.S. 362, 405-06 (2000).

Under the "'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id.  at 413. Whether a state court's application of federal law is "unreasonable" must be judged objectively; an application may be incorrect, but still not unreasonable. Id. at 409-10.

A court begins the analysis by determining the relevant clearly established law. See Yarborough v. Alvarado, 541 U.S. 652, 660 (2004). Clearly established law "refers to the holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. A court must look for "the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Lockyer v. Andrade, 538 U.S. 63, 71, 72 (2003).

## III.  DISCUSSION

The standard for determining the validity of a guilty plea is "whether the plea represents a voluntary intelligent choice among the alternative courses open to the defendant."  North Carolina v. Alford, 400 U.S. 25, 31 (1970); see also Boykin v. Alabama, 395 U.S. 238, 242 (1969) (a guilty plea is invalid only if it is not the result of the defendant's knowing and voluntary waiver of his/her rights or if the offered plea has no factual basis).  "Several federal constitutional rights are involved in a waiver that takes place when a plea of guilty is entered in a state criminal trial[,]" including the defendant's privilege against compulsory self-incrimination, his right to trial by jury, and his right to confront his accusers. Boykin, 395 U.S. at 243.   The voluntariness of a plea "can be determined only by considering all of the relevant circumstances surrounding it."  Brady v. United States, 397 U.S. 742, 749 (1970). Relevant circumstances include the petitioner's statements during the plea colloquy:

> [T]he representations of the defendant, his lawyer, and the prosecutor at [the plea] hearing, as well as any findings made by the judge accepting the plea, constitute a formidable barrier in any subsequent collateral proceedings. Solemn declarations in open court carry a strong presumption of verity.  The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal, as are contentions that in the face of the record are wholly incredible.

Blackledge v. Allison, 431 U.S. 63, 73-74 (1977).[6]

---

[6]

[W]hen we . . . considered the meaning of a "voluntar[iness] of a] guilty plea, we [utilized] the standards of "voluntariness" developed in the coerced-confession cases.  See Brady v. United States, 397 U.S. 742, 749. [The relevant case law] yield[s] no talismanic definition of "voluntariness," mechanically applicable to the host of situations where the question has arisen.  "The notion of 'voluntariness,'" Mr. Justice Frankfurter once wrote, "is itself an amphibian." Culombe v. Connecticut, 367 U.S. 568, 604-605 [(1961)].  It cannot be taken literally to mean a "knowing" choice.  "Except where a person is unconscious or drugged or

(continued...)

Once a guilty plea has been entered by a criminal defendant, all non-jurisdictional defects in the proceedings prior to the plea are waived, including all claims of ineffective assistance of counsel "except insofar as the ineffectiveness is alleged to have rendered the guilty plea involuntary." United States v. Glinsey, 209 F.3d 386, 392 (5th Cir. 2000). As the Supreme Court summarized:

> [A] guilty plea represents a break in the chain of events which has preceded it in the criminal process. When a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea. He may only attack the

---

[6](...continued)
otherwise lacks capacity for conscious choice, all [his/her] statements — even those made under brutal treatment — are 'voluntary' in the sense of representing a choice of alternatives. On the other hand, if 'voluntariness' incorporates notions of 'but-for' cause, the question should be whether the statement would have been made even absent inquiry or other official action. Under such a test, virtually no statement would be voluntary because very few people [make] statements in the absence of official action of some kind." Bator & Vorenberg, Arrest. Detention. Interrogation and the Right to Counsel: Basic Problems and Possible Legislative Solutions, 66 Col. L. Rev. 62, 72-73; see also 3 J. Wigmore, Evidence § 826 (J. Chadbourn, rev. 1970). It is thus evident that neither linguistics nor epistemology will provide a ready definition of the meaning of "voluntariness." Rather, "voluntariness" has reflected an accommodation of the complex of values implicated [by the process of examining the defendant's options].

Schneckloth v. Bustamonte, 412 U.S. 218, 224-25 (1973) (footnotes 6 and 7 incorporated into the main text, parenthetical quotation omitted); see also Brady, 397 U.S. at 757 ("The voluntariness of [the defendant's] plea can be determined only by considering all of the relevant circumstances surrounding it. One of these circumstances was the possibility of a heavier sentence following a guilty verdict after a trial. It may be that [the defendant], faced with a strong case against him and recognizing that his chances for acquittal were slight, preferred to plead guilty and thus limit the penalty . . . rather than to elect a jury trial which could result in a [heavier] penalty. But even if we assume that [the defendant] would not have pleaded guilty except for [his/her fears of a heavier] penalty . . ., this assumption merely identifies the penalty provision as a 'but for' cause of his plea [and] does not necessarily [mean] that the plea was coerced and invalid as an involuntary act") (citing Haynes v. Washington, 373 U.S. 503, 513 (1963); Leyra v. Denno, 347 U.S. 556, 558 (1954), footnote omitted).

voluntary and intelligent character of the guilty plea by showing that the advice he received from counsel was not within the standards set forth in McMann.

Tollett v. Henderson, 411 U.S. 258, 267 (1973) (referring to McMann v. Richardson, 397 U.S. 759 (1970)).

Conversely, a criminal defendant cannot attack his guilty plea on the grounds that such plea was not as favorable as he hoped.  The Supreme "Court has repeatedly recognized that difficult choices are a necessary byproduct of the criminal justice system, and of plea bargaining in particular."  Halbert v. Michigan, 545 U.S. 605, 638 (2005) (citing United States v. Mezzanatto, 513 U.S. 196, 200-201 (1995), and Brady v. United States, 397 U.S. 742, 750 (1970)).

In other words, both the nature of a guilty plea and the issue of a criminal defendant's voluntariness in accepting that plea derive from the inquiry as to whether the defendant voluntarily conceded that he committed the actual acts underlying the criminal offenses upon which the plea agreement is based.  See Menna v. New York, 423 U.S. 61, 62 n.2 (1975) (the gist of any  guilty plea is to conclusively establish the *factual predicate* for the offense to which the defendant is pleading guilty).

When a petitioner challenges the voluntariness of his plea based upon allegations of ineffective assistance of counsel, that claim introduces an additional lawyer of inquiry, bringing into the consideration the two-prong standard set forth in Strickland v. Washington, 466 U.S. 668 (1984).  See Hill v. Lockhart, 474 U.S. 52, 58 (1985); see also Premo v. Moore, 131 S. Ct. 733, 737-38 (2011) (identifying Strickland as the clearly established federal law governing a habeas petitioner's challenge to his conviction obtained through a plea bargain). To obtain relief under

16

Strickland, a petitioner must establish that: (1) "counsel's representation fell below an objective standard of reasonableness," and (2) "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.

In a plea situation, the focus of Strickland's performance prong is "whether counsel's advice 'was within the range of competence demanded of attorneys in criminal cases.'" Hill, 474 U.S. at 56-57 (quoting McMann, 397 U.S. at 771). "Judicial scrutiny of counsel's performance must be highly deferential," and courts should make every effort to "eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland,  466 U.S. at 689. Representation is ineffective only if counsel commits "serious derelictions" of his duty when advising the accused.  See Stano v. Dugger, 921 F.2d 1125, 1150-51 (11th Cir. 1991).[7]

To meet Strickland's prejudice prong in a plea situation, petitioner must establish that "counsel's constitutionally ineffective performance affected the outcome of the plea process." Hill, 474 U.S. at 59.  "It is not enough for [petitioner] to show that the errors had some conceivable effect on the outcome of the proceeding." Strickland, 466 U.S. at 693.  Rather, the

---

[7]    See also, Strickland, 466 U.S. at 689 ("Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy"); Thomas v. Varner, 428 F. 3d 491, 499 (3d Cir. 2005) ("To overcome the Strickland presumption that, under the circumstances, a challenged action might be considered sound trial strategy, a habeas petitioner must show either that: (1) the suggested strategy (even if sound) was not in fact motivating counsel or, (2) that the actions could never be considered part of a sound strategy").

petitioner must demonstrate a reasonable probability that, but for counsel's errors, he would not have pled guilty at all and would have insisted on going to trial. See Hill, 474 U.S. at 58-59. "Surmounting Strickland's high bar is never an easy task." Padilla v. Kentucky, 130 S. Ct. 1473, 1485 (2010). "Establishing that a state court's application of Strickland was unreasonable under § 2254(d) is all the more difficult." Richter, 131 S. Ct. at 788. As the Richter Court explained:

> The standards created by Strickland and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so. The Strickland standard is a general one, so the range of reasonable applications is substantial. Federal habeas courts must guard against the danger of equating unreasonableness under Strickland with unreasonableness under § 2254(d). When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard.

Id. (citations omitted).

Here, Petitioner did not assert that his counsel pressured him into falsely admitting to the acts underlying Petitioner's conviction; on the contrary, the record establishes, and with abundance, that Petitioner voluntarily conceded that he: (a) restrained Mr. Bogart and kept him in confinement at Petitioner's residence; (b) forced Mr. Hall to accompany Petitioner to Mr. Bogart's residence; (c) threatened both Messrs. Bogart and Hall with Petitioner's loaded gun; (d) had that gun in working condition in his possession, illegally, and for illegal purposes, and so on. Therefore, the issue of Petitioner's "voluntariness" of pleading guilty to these acts is, altogether, not at issue, regardless of Petitioner's attempts to frame his claims in terms of involuntariness" of his plea. Analogously, the fact that Petitioner's counsel's advice to plead guilty to the actions which Petitioner admittedly committed was, undoubtedly, within the range of competence of Petitioner's counsel. Therefore, Petitioner's position is without merit at its threshold point.

Moreover, Petitioner never asserted, either during his direct appellate review or during his

PCR proceedings, or even in the instant habeas matter, that Petitioner had a slightest inclination

to take his chances at trial.  Rather, the record accumulated during Petitioner's plea proceedings

unambiguously indicated that Petitioner was elated to escape the maximus sentence he could face

(which, in light of consecutive application, could add up to 80 years of imprisonment and over $

705,000 in fines) and wanted to close his criminal proceedings only by a plea agreement.  Thus,

Petitioner's claims could be reduced to two points: (a) his desire was to obtain the best sentence

he could; and (b) his fleeting reluctance to embrace the fact that the penal code provided

technical definitions of "kidnapping" and "terroristic threats" different from the images Petitioner

obtained from the mass-media and/or entertainment industry.  However, Petitioner's counsel's

insistence on adhesion to the technical meaning of these terms (instead of adopting Petitioner's

entertainment-industry-based perceptions of these terms) was not a violation of the counsel's

Sixth Amendment duties; on the contrary, had Petitioner's counsel adopted Petitioner's mass-

media-based perception of these terms and advised Petitioner not to plea guilty to the crimes of

kidnapping and terroristic threats, hence "botching" Petitioner's plea agreement, Petitioner's

counsel's conduct would, likely, have violated both prongs of the Strickland test.  Cf. Boyd v.

Warden, 579 F.3d 330, 365 and nn. 28 and 29 (3d Cir. 2009) (en banc) (finding potential

violation of the strickland test while addressing the scenario where a defense counsel did not

directly communicate the original plea offer because, at the time, the offer appeared unacceptable

in light of the counsel's client's perceptions of law and desired term of imprisonment).

Analogously, the fact that Petitioner's counsel was unable to negotiate a better sentence cannot

place the counsel's performance outside constitutional norms: a criminal defendant's plea

agreement cannot be undone because it is a result of a difficult choices and offered terms less advantageous than those aspired for by that defendant.  See Halbert v. Michigan, 545 U.S. at 638.

Consequently, the assistance provided by Petitioner's counsel with regard to facilitation of Petitioner's plea agreement was well within the constitutional safeguards, as defined by Strickland, Hill, McMann, Menna and Halbert (in light of the considerations defined in Boykin), and the state court's decision to that effect was not an unreasonable application of the above-detailed governing line of Supreme Court precedent.

As to the remainder of Petitioner's challenges to his counsel's pre-Petitioner's-plea-taking performance, i.e., Petitioner's challenges that his counsel failed to file a certain suppression motion, or did not investigate certain unnamed witnesses who, allegedly, might have been helpful to Petitioner's cause, or that the counsel did not discuss the strength and weaknesses of Petitioner's case with the degree of detail Petitioner would have preferred, etc., cannot be raised in the instant Petition; this is so because a guilty plea has been entered by Petitioner, and his non-jurisdictional challenges to the instances of his criminal proceedings that took place prior to the plea cannot be raised on collateral review, including all claims based on the alleged instances of ineffective assistance of counsel "except insofar as the ineffectiveness is alleged to have rendered the guilty plea involuntary."  United States v. Glinsey, 209 F.3d at 392; accord Boyd v. Warden, 579 F.3d at 349 (relying on the same proposition); Cooper v. Carroll, 2007 U.S. Dist. LEXIS 82574 (D. Del. Nov. 7, 2007) (stating the same, with reliance on Tollett, Glinsey and comparing this scenario with United States v. Porter, 405 F.3d 1136, 1141 (10th Cir. 2005), the matter where entry of plea did not waive claim of ineffective assistance asserting petitioner's dissatisfaction with counsel's post-plea performance).

20

## IV.  CERTIFICATE OF APPEALABILITY

The Court denies a certificate of appealability because Petitioner has not made "a

substantial showing of the denial of a constitutional right" under 28 U.S.C. § 2253(c)(2).  See

Miller-El v. Cockrell, 537 U.S. 322 (2003).

## V.  CONCLUSION

Based on the foregoing, the Court will deny the Petition with prejudice and will decline to

issue a certificate of appealability under 28 U.S.C. § 2253(c).


s/ Faith S. Hochberg
**Faith S. Hochberg,**
**United States District Judge**

Dated: January 31, 2012

21